[No. B006071. Second Dist., Div. Seven. Dec. 20, 1984.]

CEDARS-SINAI MEDICAL CENTER, Plaintiff and Respondent, v. STATE BOARD OF EQUALIZATION, Defendant and Appellant.

COUNSEL

John K. Van de Kamp, Attorney General, Edmond B. Mamer and Richard E. Nielsen, Deputy Attorneys General, for Defendant and Appellant.

Loeb & Loeb, John S. Warren and Andrew S. Garb for Plaintiff and Respondent.

OPINION

**LILLIE, P. J.**—Cedars-Sinai Medical Center sued the State Board of Equalization for refund of use taxes paid by it pursuant to deficiency deter-

mination following the board's denial of claim for refund. Defendant appeals from judgment in favor of plaintiff.

The case was tried by the court without a jury upon the following stipulation of facts.

Prior to April 1976, in anticipation of the opening of its new medical center, plaintiff arranged to acquire certain medical equipment and furnishings from various vendors at a total cost of $6,293,209, including sales tax. Plaintiff issued purchase orders to the vendors and the vendors issued invoices to plaintiff showing the purchase price of the equipment and the sales tax thereon. Plaintiff paid to each vendor approximately 90-95 percent of the purchase price including sales tax reimbursement. Plaintiff took possession of the equipment and put it into use. In the summer of 1976 it became apparent to plaintiff, because of cost overruns in the construction of its new medical center, that the permanent financing for the facility would not be sufficient to enable plaintiff to pay for both the building and the equipment. In order to obtain alternative financing for the equipment, plaintiff entered into agreements with Girard Leasing Company, Lease Investment Corporation and LSI Leasing Venture No. 402, each of which is located outside of California. The agreements were made in November and December 1976, before plaintiff paid the full purchase price of the equipment to the vendors and after plaintiff put the equipment into use. Pursuant to the agreements plaintiff made written assignments to the companies of all its right, title and interest in the purchase orders and invoices with the vendors. The vendors did not expressly release plaintiff of its obligation to pay the balance due on the purchase price but did rebill the leasing companies for the purchase price of the equipment and gave credit for the amounts previously paid by plaintiff. The leasing companies paid the balance of the purchase price to the vendors. The amounts billed by the vendors for the equipment, and paid in part by plaintiff and in part by the leasing companies, included reimbursement for sales tax in the total amount of $346,674 measured by the selling price of the equipment. The vendors paid said amount of sales tax to defendant.

Under the agreements between plaintiff and the leasing companies, the latter paid to plaintiff a sum equal to the amounts plaintiff had paid to the vendors, except that one of the companies did not pay plaintiff the amount it had paid to vendors as sales tax; plaintiff agreed to make repayments to the leasing companies in monthly installments over a five-year period with a balloon payment at the end of the period. Possession and control of the equipment were retained by plaintiff and never were acquired by the leasing companies. No bill of sale or other transfer documents were given by plain-

tiff to any of the leasing companies with the exception of the assignments of purchase orders and invoices. Plaintiff did not report on its sales and use tax returns the amounts it received from the leasing companies; the leasing companies did not report or remit sales or use tax on the amounts paid by plaintiff to them.

As originally written, the agreements between plaintiff and the leasing companies gave plaintiff the option to acquire legal title to the equipment at the end of the period by paying to the leasing companies the fair market value of the equipment at that time (balloon payment). Plaintiff knew from the outset that it would want to retain the equipment permanently and became concerned about the rising prices of such equipment. Accordingly, in February 1978 plaintiff obtained an amendment to each agreement whereby the leasing company agreed to a fixed dollar figure for the balloon payment and plaintiff agreed that the balloon payment was mandatory rather than optional. The fixed dollar figure was an arbitrary, but not nominal, amount arrived at by negotiation and bore no particular relationship to the market value of the equipment. Plaintiff thereafter paid to each leasing company the remaining monthly installments and the agreed upon balloon payment. Plaintiff paid no use tax on its payments to the leasing companies. Defendant determined that plaintiff was liable for use tax on the monthly payments plaintiff had made to the leasing companies during the period October 1, 1976 through September 30, 1979, and issued a deficiency determination in the amount of $178,043. Plaintiff paid that sum to defendant and filed a timely claim for refund. Defendant denied the claim.

The trial court determined that the transaction between plaintiff and the leasing companies was not a sale of the equipment by plaintiff to the companies and a lease of the equipment by them to plaintiff, but was an arrangement whereby plaintiff obtained financing of the equipment from the companies; accordingly, no sales or use tax was generated by the transaction and plaintiff is entitled to a refund of the use tax it paid to defendant.[1] Judgment was entered in favor of plaintiff and against defendant for $178,043 plus interest thereon. This appeal followed.

Inasmuch as the case was submitted on a stipulation of facts with documents, we are confronted with purely a question of law and are not bound by the determination of the trial court. (*Oliver & Williams Elevator Corp. v. State Bd. of Equalization* (1975) 48 Cal.App.3d 890, 894 [122 Cal.Rptr. 249]; *Montgomery Ward & Co. v. State Bd. of Equalization* (1969) 272

---

[1]No statement of decision was issued, none having been requested. (Code Civ. Proc., § 632.)

Cal.:App.2d 728, 734 [78 Cal.Rptr. 373].) There being no issue of fact, it is our duty to make the final determination in accord with the applicable principles of law. (*Meyer* v. *State Board of Equalization* (1954) 42 Cal.2d 376, 381 [267 P.2d 257].)

Defendant contends there were two sales of the equipment: sale by the vendors to plaintiff and a second sale by plaintiff to the leasing companies with the latter leasing the equipment back to plaintiff; since the leasing companies paid neither sales tax reimbursement to plaintiff nor use tax to defendant, the monthly lease payments made by plaintiff were subject to the use tax. (See Rev. & Tax. Code, §§ 6006, subd. (g)(5) and 6010, subd. (e)(5); *Debtor Reorganizers, Inc.* v. *State Bd. of Equalization* (1976) 58 Cal.App.3d 691, 698 [130 Cal.Rptr. 64].) For taxation purposes "sale" includes "[a]ny transfer of title or possession . . . in any manner or by any means whatsoever, of tangible personal property for a consideration." (Rev. & Tax. Code, § 6006, subd. (a).) In support of its argument that there was a sale of the equipment by plaintiff to the leasing companies, defendant relies on language of the purchase order assignments and the lease agreements transferring to the companies plaintiff's title in the equipment.[2] ■ However, "in sales and use tax matters the language utilized by the parties to characterize their transactions does not, in itself, necessarily control." (*Southern California Edison Co.* v. *State Board of Equalization* (1972) 7 Cal.3d 652, 662 [102 Cal.Rptr. 766, 498 P.2d 1014].) ■ In the interpretation of contracts, the paramount consideration is the intention of the contracting parties as it existed at the time of contracting. (Civ. Code, § 1636; *Moss Dev. Co.* v. *Geary* (1974) 41 Cal.App.3d 1, 9 [115 Cal.Rptr. 736].) The court must examine an instrument in the light of the circumstances surrounding its execution so as to ascertain what the parties meant by the words they used. (*Estate of Russell* (1968) 69 Cal.2d 200, 208-209 [70 Cal.Rptr. 561, 444 P.2d 353].) In determining the intention of the parties in relation to the execution of a contract, "the court may look to the circumstances surrounding the making of the agreement, including the object, nature, and subject matter of the writing, and thereby 'place itself' for this purpose in the same situation in which the parties found themselves at the time of contracting. (Civ. Code, § 1647; Code Civ. Proc., § 1860; . . ." *Dunne & Gaston* v. *Keltner* (1975) 50 Cal.App.3d 560, 564

---

[2]For example, the "Purchase Order Assignment and Confirmatory Bill of Sale" provides in part: "To the extent, if any, that title to some or all of the Equipment heretofore has passed to Lessee, Lessee hereby sells and transfers all of Lessee's right, title and interest in said Equipment to Lessor, its successors and assigns, absolutely."

The lease agreements include the following provision: "This is a contract of lease only, and nothing herein shall be construed as conveying to Lessee any right, title, or interest in or to any leased Unit, except as Lessee only. Title to each leased Unit shall at all times remain in Lessor . . . ."

[123 Cal.Rptr. 430].) ■ The contract must be construed as a whole; detached words or clauses standing alone are not controlling on the question of interpretation, each being viewed in relation to the agreement as an entity. (Civ. Code, § 1641; *Bodle* v. *Bodle* (1978) 76 Cal.App.3d 758, 764 [143 Cal.Rptr. 115].)

■ The definition of "sale" in Revenue and Taxation Code section 6006 was designed to parallel the common law and the Uniform Commercial Code definitions of "sale." (*Select Base Materials* v. *Board of Equal.* (1959) 51 Cal.2d 640, 645 [335 P.2d 672]; *King* v. *State Bd. of Equalization* (1972) 22 Cal.App.3d 1006, 1012 [99 Cal.Rptr. 802].) The latter definition is as follows: "A 'sale' consists of the passing of title from the seller to the buyer for a price . . . ." (Cal. U. Com. Code, § 2106, subd. (1).) The provisions of the Uniform Commercial Code relating to sales are drafted "in terms of contract for sale and the various steps of its performance. The legal consequences are stated as following directly from the contract and action taken under it without resorting to the idea of when property or title passed or was to pass as being the determining factor. The purpose is to avoid making practical issues between practical men turn upon the location of an intangible something, the passing of which no man can prove by evidence and to substitute for such abstractions proof of words and actions of a tangible character." (U. Com. Code, § 2-101, comment.) The Code "de-emphasized the importance of the concept [of title] in favor of a more direct approach to such questions as risk of loss [citation], insurable interest [citation], the buyer's right to the goods [citation], and the seller's right to payment [citation]." (2 Witkin, Summary of Cal. Law (8th ed. 1973) Sales, § 110, p. 1171.)

■ Plaintiff entered into the agreements with the leasing companies in order to obtain alternative financing of the equipment. That such was the object of the agreements, and the mutual intention of the companies, is shown by reasonable inference (from the undisputed evidence) that the companies, all of which are located outside of California, had no use for the equipment and were not interested in purchasing it from plaintiff. Indeed, following execution of the agreements the equipment remained at plaintiff's facility and was used by plaintiff there, just as it had been used after plaintiff purchased it from the vendors. Under the lease agreements between plaintiff and the companies, plaintiff was responsible for payment of all license fees, assessments, and property, sales, use and other taxes imposed by any federal, state or local government or agency upon any of the equipment. Plaintiff assumed all risk of loss and liability in the operation, maintenance and storage of the equipment, and for damages for injury or death to persons or property arising therefrom. Plaintiff was required to keep the equipment

insured against all risks of loss or damage "as are customarily insured against by companies owning equipment of similar character and engaged in a business similar to that engaged in" by plaintiff. The foregoing circumstances and provisions are inconsistent with a "sale" of the equipment by plaintiff to the leasing companies and indicate that despite plaintiff's formal transfer of title to the companies, plaintiff remained the owner of the equipment.

The leasing companies reimbursed plaintiff for its partial payment of the purchase price of the equipment to the vendors, and paid the balance of the purchase price to them. By the terms of its transactions with the companies, plaintiff paid to them total "rent" for the equipment which exceeded its purchase price.[3] As a practical matter plaintiff had no reason to "sell" the equipment to the companies and "rent" it back from them at a total cost to plaintiff of approximately $1,426,400 more than the original cost of the equipment. Viewed in their entirety plaintiff's transactions with the leasing companies were devices by which plaintiff in effect borrowed from them the money necessary to pay the full purchase price of the equipment to the vendors; the leasing companies reimbursed plaintiff for that portion of the purchase price it had paid to the vendors and then paid the balance of the price to the vendors on plaintiff's behalf; plaintiff, in the form of rent, repaid the companies the total amount of the purchase price plus interest. There was but one sale of the equipment—by the vendors to plaintiff. ■ "The sales and use taxes are mutually exclusive . . . . [¶] . . . 'The use tax is complemental to the sales tax, and as such is intended to supplement the latter by imposing upon those subject to it a tax burden equivalent to the sales tax in order that tangible personal property sold or utilized in this state would be taxable once for the support of the state government. [Citations.] ■ The tax is limited to the "'*use* . . . of property *purchased for use*'" within the state. [Citations.] It is not intended to apply to property subject to the sales tax. [Citation.] This does not mean, however, that all property which is subject to the sales tax is exempt from the use tax, "but, rather, that all property *not actually covered* by the sales tax is subject to the use tax." [Citation.]'" (*American Airlines, Inc.* v. *State Board of Equalization* (1963) 216 Cal.App.2d 180, 188-190 [30 Cal.Rptr. 590], original italics.) ■ On sale of the equipment by the vendors to plaintiff, the sales tax

[3]The total purchase price of the equipment (including sales tax) covered by plaintiff's transaction with LSI Leasing Venture was $2,186,216.65; the total rent payment required of plaintiff under its five-year lease with that company was $2,731,153.20.

In its transaction with Girard Leasing Company plaintiff paid total rent of $3,337,354.80 on equipment the purchase price of which was $2,726,597.23. In plaintiff's transaction with Lease Investment Corporation those amounts were, respectively, $1,669,120 and $1,380,395.83.

was collected by the vendors, in part from plaintiff and in part from the leasing companies, and was paid to defendant. Plaintiff's transactions with the leasing companies did not involve, in fact or in substance, a sale of the equipment by plaintiff to the companies and a lease-back of the equipment by them to plaintiff. Accordingly, those transactions were not subject to sales or use tax.

In view of this conclusion it is unnecessary to consider whether, as plaintiff contends and defendant denies, the leases were intended as security (Cal. U. Com. Code, § 1201, subd. (37)) and thus did not give rise to a use tax. (See *Footpress Corp.* v. *Strickland* (1978) 242 Ga. 686 [251 S.E.2d 278]; *In re Sherwood Diversified Services, Inc.* (S.D.N.Y. 1974) 382 F.Supp. 1359.)

DISPOSITION

The judgment is affirmed.

Thompson, J., and Johnson, J., concurred.

A petition for a rehearing was denied January 11, 1985, and appellant's petition for a hearing by the Supreme Court was denied February 13, 1985.