United States Court of Appeals,

Fifth Circuit.

No. 91-1890.

FEDERAL DEPOSIT INSURANCE CORPORATION, In its corporate capacity, Plaintiff-Appellee,

v.

H. Clayton BRANTS, Jr. and Lee A. Smith, Defendants,

H. Clayton Brants, Jr., Defendant-Appellant.[*]

FEDERAL DEPOSIT INSURANCE CORPORATION, In its corporate capacity, Plaintiff-Appellee,

v.

O.L. PITTS, Defendant-Appellant.

Sept. 22, 1993.

Appeal from the United States District Court for the Northern District of Texas.

Before GOLDBERG, SMITH, and EMILIO M. GARZA, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

Defendants, H. Clayton Brants, Jr. and O.L. Pitts ("Brants and Pitts" or "defendants"), executed separate notes in favor of the Federal Deposit Insurance Corporation's ("FDIC") predecessor in interest, and later defaulted on those notes. When the FDIC sued to collect on the notes, Brants and Pitts contended that they had been released from their obligations by a settlement agreement signed by the FDIC in a lawsuit against other defendants in California. The magistrate disagreed with Brants and Pitts, and entered judgment in favor of the FDIC. Brants and Pitts appeal, arguing that the plain and unambiguous terms of the California settlement agreement released them from their obligations. Because we find that the parties to the California settlement agreement did not intend to release Brants and Pitts, we affirm.

_____

[*]This case began as two separate actions, styled *Continental Illinois Bank & Trust Co. of Chicago v. H. Clayton Brants, Jr. and Lee A. Smith* and *Continental Illinois Bank & Trust Co. of Chicago v. O.L. Pitts.* Prior to trial the FDIC was substituted for Continental as party plaintiff, and the two cases were consolidated. We dismissed the appeal filed by Lee A. Smith pursuant to his motion.

# I

The facts of this case are undisputed. Brants and Pitts both borrowed money from Penn Square Bank and executed notes in the bank's favor. With the acquired funds, Brants purchased a limited partnership interest in an oil and gas drilling venture by the name of Calpetco III-1980. Pitts purchased a limited partnership interest in a similar venture known as Calpetco 80-B. Limited partnership interests in Calpetco III-1980 were also purchased by Allan Littman, William Edlund, Walter Hahne, and J.D. McPherson, who also executed notes in favor of Penn Square Bank. Penn Square held the aforementioned notes subject to a participation interest owned by Continental Illinois National Bank and Trust Company of Chicago ("Continental"). When Penn Square failed, Continental succeeded to Penn Square's interest in the notes.

Thereafter, all of the aforementioned debtors defaulted on their notes, and Continental sued to collect. One action was filed in the Northern District of California against Littman, Edlund, Hahne, and McPherson (also referred to as "the California defendants"). Separate suits were filed against Brants and Pitts (also referred to as "the Texas defendants") in the Northern District of Texas. Continental later conveyed its entire interest in the notes to the FDIC, and the FDIC was substituted for Continental as party plaintiff in the actions.

Because the facts and legal issues in the California and Texas lawsuits were substantially similar, Brants, Pitts, and the FDIC agreed to stay the Texas actions pending a final judgment in the California litigation, and to be bound by the judgment entered in California. The court in California entered judgment in favor of the FDIC, holding the California defendants personally liable on their notes. While an appeal was pending in the California litigation, Edlund, Hahne, Littman, and the estate of McPherson entered into a Settlement Agreement and Mutual Release (also referred to as "the California settlement") with the FDIC. Paragraph two of the settlement agreement provides for a release of certain claims against the California defendants and related parties as follows:

> The FDIC-Corporate, the FDIC-Receiver, and Continental Bank, on behalf of themselves and their former, present and future joint ventures, partnerships, parent, subsidiary and affiliate corporations, partners, principals, agents, predecessors, successors, assigns, heirs, executors, administrators and representatives, hereby fully and forever waive, relinquish, release and discharge Edlund, Hahne, Littman and McPherson and their former, present and future joint ventures, partnerships, parent, subsidiary and affiliate corporations, partners,

principals, agents, predecessors, successors, assigns, heirs, executors, administrators and representatives of and from, without limitation, any and all claims, demands, controversies, actions, causes of action, debts, liabilities, rights, contracts, damages, interest obligations, costs (including attorneys' fees and court and litigation costs and expenses), expenses, indemnities, obligations and losses of every kind or nature whatsoever, whether at this time known or unknown, anticipated or unanticipated, direct or indirect, fixed or contingent, that may presently exist or may hereafter arise or become known, for or by reason of any act, omission, events, transaction, matter or cause whatsoever from the beginning of time to the date of this Agreement, directly or indirectly related to, arising from, or which could be inferred or implied by or included in connection with the Action and/or the Appeal, and the facts upon which the Action and the Appeal were brought and based, and any and all acts or omissions of Edlund, Hahne, Littman and McPherson whatsoever occurring or arising or in any way related to the Action, the Appeal, Calpetco III-1980, or any loan agreement or other document related thereto.

Defendants' Exhibit 2 at 2-3. The FDIC also agreed to return the notes of the California defendants. In return for this settlement, the California defendants agreed to pay the FDIC $1,003,594.25. The settlement agreement does not mention Brants or Pitts by name, require them to pay consideration, or provide for the return of their notes.

This case proceeded to trial.[1] Brants and Pitts contended that they were not liable to the FDIC on their notes because they had been released from liability by the California settlement. The magistrate considered the language of the settlement and the circumstances surrounding its execution, and held that the FDIC's claims against Brants and Pitts were not released. Judgment was entered in favor of the FDIC, and Brants and Pitts appeal.

## II

Pitts and Brants contend that, according to the clear and unambiguous terms of the settlement, they are released from liability to the FDIC on their notes. "In the interpretation of contracts, the paramount consideration is the intention of the contracting parties as it existed at the time of contracting." *Cedars-Sinai Medical Ctr. v. State Bd. of Equalization,* 162 Cal.App.3d 1182, 208 Cal.Rptr. 837, 839 (1984); *see also Leo F. Piazza Paving Co. v. Foundation Constructors, Inc.,* 128 Cal.App.3d 583, 177 Cal.Rptr. 268, 273 (1981) ("The paramount rule governing the interpretation of contracts is to give effect to the mutual intention of the parties as it existed at the

---

[1]The actions against Brants and Pitts were consolidated prior to trial. The case was tried before a magistrate, pursuant to 28 U.S.C. § 636(c)(1) (1988).

time of contracting...."). [2] "The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity." Cal.Civ.Code § 1638 (West 1993). However, in order to determine initially whether the terms of a contract are clear and unambiguous, "the court must examine the [contract] in the light of the circumstances surrounding its execution so as to ascertain what the parties meant by the words used." *In re Estate of Russell,* 69 Cal.2d 200, 70 Cal.Rptr. 561, 567, 444 P.2d 353, 359 (1968). In examining the circumstances surrounding the making of the contract, the court may take into account "the object, nature, and subject matter of the writing." *Cedars-Sinai,* 208 Cal.Rptr. at 839-40; *see also Piazza Paving,* 177 Cal.Rptr. at 273 ("The words, phrases, and sentences employed are to be construed in light of the objectives and fundamental purposes of the parties to the agreement."). The court determines the meaning of contract terms by way of "a reading of the entire contract." *Rodriguez v. Barnett,* 52 Cal.2d 154, 338 P.2d 907, 910 (1959); *see also Cedars-Sinai,* 208 Cal.Rptr. at 840; *Stewart Title Co. v. Herbert,* 6 Cal.App.3d 957, 96 Cal.Rptr. 631, 634 (1970). A court's interpretation of a contract, based on the circumstances surrounding its execution and the plain language of the agreement, is a conclusion of law which we review de novo. *See Estate of Russell,* 70 Cal.Rptr. at 570, 444 P.2d at 362 ("[I]t is "solely a judicial function to interpret a written instrument unless the interpretation turns upon the credibility of extrinsic evidence.' Accordingly, "an appellate court is not bound by a construction of a document based solely upon the terms of the written instrument without the aid of extrinsic evidence, where there is no conflict in the evidence....' " (citation omitted)); *Cedars-Sinai,* 208 Cal.Rptr. at 839 ("Inasmuch as the case was submitted on a stipulation of facts with documents, we are confronted with purely a question of law and are not bound by the determination of the trial court.").

The issue here is whether the FDIC's claims against Brants and Pitts fall within the category of claims released by the agreement. The settlement releases claims of virtually any type,[3] so long as

---

[2]The parties agree that the interpretation of the California settlement is governed by California law.

[3]The FDIC agreed to relinquish "claims, demands, controversies, actions, causes of action, debts, liabilities, rights, contracts, damages, interest obligations, costs (including attorneys' fees and court and litigation costs and expenses), expenses, indemnities, obligations and losses of every kind or nature whatsoever."

they satisfy certain conditions. Specifically, a claim must

> exist or ... arise or become known, for or by reason of any act, omission, events, transaction, matter or cause whatsoever from the beginning of time to the date of this Agreement, directly or indirectly related to, arising from, or which could be inferred or implied by or included in connection with the Action and/or the Appeal, and the facts upon which the Action and the Appeal were brought and based, and any and all acts or omissions of Edlund, Hahne, Littman and McPherson whatsoever occurring or arising or in any way related to the Action, the Appeal, Calpetco III-1980, or any loan agreement or other document related thereto.

Defendants' Exhibit 2 at 3. It is the operation of these conditions which is in dispute in this case.[4]

Brants and Pitts argue that the foregoing provision releases two categories of claims. The first category consists of "claims that exist or arise by reason of any acts and omissions whatsoever related to the action or appeal, and the facts." Reply Brief for Brants and Pitts at 7. The second category consists of "claims that exist or arise by reason of any acts and omissions of Edlund, et al., whatsoever related to the action, appeal, Calpetco or documents." *Id.* Brants and Pitts argue that the FDIC's claims against them fall within the first category.

We reject this bifurcated construction of the release, because it is unsupported by the language of the contract. The release provision is a single sentence, the subject of which is the group of parties, including the FDIC, who are releasing other parties from their obligations. The predicate of the sentence is the phrase "hereby fully and forever waive, relinquish, release and discharge." The sentence has several direct objects, which are the parties, including the California defendants, being released "of and from" certain claims. The claims from which those parties are released—"claims, demands, controversies, actions, causes of action, debts, [etc.]"—make up the indirect objects of the sentence. The language which follows is a series of phrases and clauses which describe the indirect objects.

The interpretation advocated by Brants and Pitts is inconsistent with the structure of the release provision. Brants and Pitts describe the agreement as releasing them of and from (1) "claims that exist or arise by reason of any acts and omissions whatsoever related to the action or appeal, and

[4]There is also a dispute as to whether or not Pitts falls within the category of persons whose claims are released—partners, principals, agents, predecessors, successors, etc. However, because we conclude that the FDIC's claims against Brants and Pitts do not satisfy the conditions for release under the settlement agreement, *see infra,* neither defendant is entitled to relief, and we need not decide whether Pitts falls within the category of persons whose claims are released.

the facts," and (2) "claims that exist or arise by reason of any acts and omissions of Edlund, et al., whatsoever related to the action, appeal, Calpetco or documents." However, the release language does not have that structure. In the release the word "claims," accompanied by its many variations, appears only once. In the defendants' paraphrase of the release, the word "claims" appears twice, duplicating the indirect objects as they appear in the release. Because the release does not have the structure suggested by Brants and Pitts, it also does not have the meaning that they would give to it.

Had the parties to the agreement wished to provide for two categories of claims such as Brants and Pitts describe—one set connected to the Action and its underlying facts, the other connected only to the conduct of the California defendants—the parties also could have done so simply by describing the criteria for a released claim disjunctively. Two categories of claims would have been created if the parties had used the word "or" rather than the word "and" between the clause "facts upon which the Action and the Appeal were brought and based" and the clause "any and all acts or omissions of Edlund, Hahne, Littman and McPherson." Then the agreement would have released a claim whether it was connected with the Action and its underlying facts *or* the conduct of the California defendants. Instead, however, the parties chose to list the conditions conjunctively, creating a single category of claims described by all three conditions. Although it may not be a model of clarity, the release clearly does not say what Brants and Pitts say it does.

We therefore construe the settlement to release claims which exist or arise for or by reason of acts related to (1) the Action and/or the Appeal, (2) the facts underlying the Action and the Appeal, *and* (3) the conduct of the California defendants. If a claim against Brants or Pitts fails to conform to any one of these conditions, that claim is not released by the settlement, and the judgment in favor of the FDIC must be affirmed. We will first consider the third condition—that in order for the claims against Brants and Pitts to be released, those claims must "exist or ... arise or become known, for or by reason of any act, omission, events, transaction, matter or cause whatsoever ..., directly or indirectly related to, arising from, or which could be inferred or implied by or included in connection with ... any and all acts or omissions of Edlund, Hahne, Littman and McPherson whatsoever occurring or arising or in any way related to the Action, the Appeal, Calpetco III-1980,

or any loan agreement or other document related thereto."

In order to determine whether the claims against Brants and Pitts satisfy this condition, we must first determine which "act, omission, events, transaction, matter or cause" underlies the claims against Brants and Pitts. We are of the opinion that the FDIC's claims against Brants and Pitts "exist[ed] or ... ar[o]se or bec[a]me known, for or by reason of" Brants's and Pitts's failure to pay the amounts due under their notes. The defendants suggest that a more extensive set of circumstances gave rise to the claims against them, including their investment in the Calpetco partnerships, and certain representations made to them by Penn Square Bank and the promoter of the Calpetco partnerships. However, the claims against Brants and Pitts did not "exist or ... arise or become known, for or by reason of" those events. Neither the defendants' investments in the Calpetco partnerships, nor any of the other circumstances which Brants and Pitts mention, formed the basis for the claims against them. Those claims are for nonpayment of notes, and it is because of Brants's and Pitts's default that those claims arose and now exist.

Because the FDIC's claims against Brants and Pitts "exist[ed] or ... ar[o]se or bec[a]me known, for or by reason of" Brants's and Pitts's failure to pay to the FDIC the amounts due under their notes, it is that conduct by the defendants which must be "directly or indirectly related to, arising from, or which could be inferred or implied by or included in connection with ... any and all acts or omissions of Edlund, Hahne, Littman and McPherson whatsoever occurring or arising or in any way related to the Action, the Appeal, Calpetco III-1980, or any loan agreement or other document related thereto."[5] Although counsel for Brants and Pitts devote large segments of their briefs to discussing the facts of this case and the California litigation, and to arguing that a relationship existed between the two cases, they have not pointed to any particular acts or omissions of the California defendants which bear any relationship to Pitts's and Brants's defaults. Pitts and Brants have

---

[5]The language "any and all acts or omissions of Edlund, Hahne, Littman and McPherson whatsoever occurring or arising or in any way related to the Action, the Appeal, Calpetco III-1980, or any loan agreement or other document related thereto" appears to encompass virtually any conduct of the California defendants which is at all connected with Calpetco III-1980 or with the California litigation, including the California defendants' investment in Calpetco III-1980 and their subsequent default on their notes.

established that the California action and the instant litigation are highly similar, in that the two cases involve the same legal questions and similar facts. However, legal and factual similarities between this action and the California litigation do not amount to a relationship or connection between the defaults of Pitts and Brants and particular acts or omissions of the California defendants. Pitts and Brants repeatedly point out that the notes which they executed and the notes executed by the California defendants, "are interrelated to the investment which funded the Calpetco partnerships." Although that statement is correct, it does not establish that the notes executed by Pitts and Brants (much less their defaults on those notes) are related or connected to the notes executed by the California defendants. It merely establishes that both sets of notes are related to a third entity, Calpetco III-1980.[6] Pitts and Brants have not shown what the release requires—a relationship between their defaults and the acts or omissions of the California defendants.

Even if, however, some broad notion of relationship or connection were satisfied by the factual and legal similarities between the California and Texas lawsuits, or by the interrelationship between the various notes and the Calpetco partnerships, an examination of other provisions of the settlement agreement, as well as the circumstances surrounding its execution, reveals that the parties to the agreement did not intend to release claims demonstrating only that degree of connection to the conduct of the California defendants. All of the FDIC's claims against any parties connected to the Calpetco partnerships would have been relinquished by such a release, and it is apparent that such a sweeping abandonment of the FDIC's claims was not intended.

As the magistrate noted, the settlement agreement explicitly provided for the return to the

---

[6]Even this would not be accurate with respect to the note executed by Pitts, since it is undisputed that Pitts was a partner in Calpetco 80-B, and consequently he shared no partnership interest with Brants or the California defendants, all of whom were partners in Calpetco III-1980. Furthermore, we do not believe that the notes executed by the California defendants and the note executed by Brants are "indirectly related to" each other because they "are inter-related to the investment which funded" Calpetco III-1980. Two things are not necessarily related to each other merely because they are both related to something else. An indirect relationship would be present, for instance, where event A causes event B, which in turn causes event C. The relationship between A and C is indirect, but it is still a real, identifiable relationship. In our opinion, the same cannot be said of the notes executed respectively by Brants and the California defendants. It certainly is not true of Brants's and Pitts's defaults and the acts or omissions of the California defendants.

California defendants of their notes. Certainly the same could have been done for Brants and Pitts and others in their position, if it had been the intention of the parties to provide for the release of claims against them. However, the agreement did not provide for the notes executed by Brants and Pitts to be returned. Brants and Pitts point out that Bill Edlund, who acted on behalf of the other California defendants in settling the California lawsuit, was not acting on behalf of Brants and Pitts. Brants and Pitts therefore contend that "[i]t is unreasonable to suggest that Mr. Edlund was required to collect the notes and loan agreements for all of the Calpetco partners." We do not suggest that Edlund or the other California defendants had a duty to collect all of the notes. However, Edlund's failure to negotiate the return of the defendants' notes calls into question a fundamental premise of the defendants' argument—that Edlund and the other California defendants were sufficiently concerned about the interests of Brants and Pitts and others similarly situated to deliberately bargain for, and even pay consideration for the release of the claims against them. In plain terms, if Edlund was willing to pay a considerable sum of money for the release of claims against Brants and Pitts, it makes no sense that he was unwilling to arrange for their notes to be returned. Therefore, the failure of the agreement to provide for the return of Brants's and Pitts's notes militates in favor of the conclusion that the FDIC's claims against Brants and Pitts were not intended to be released.

The circumstances surrounding the execution of the settlement agreement also indicate that the parties to the agreement did not intend to release the claims against Brants and Pitts. After judgment was entered for the FDIC in the California litigation, the FDIC obtained a considerable settlement from the California defendants; and, because Brants and Pitts agreed to be bound by the California judgment, they stood in the same disadvantageous posture vis a vis the FDIC as did the California defendants. The magistrate noted, and we agree, that under those circumstances it is "incredible that the FDIC ... simply determined not to pursue the Texas Defendants as to their notes." We agree with the magistrate's conclusion that the FDIC did not intend to do so.

Brants and Pitts suggest, however, that the FDIC released its claims against them because the California defendants paid consideration to the FDIC on their behalf. Brants and Pitts rely on the testimony of William Edlund, one of the California defendants, who testified that he had a "motive

or interest for securing releases for" Brants and Pitts on their notes to Penn Square Bank. Edlund testified that "the litigation both in San Francisco and [in] Texas had been going on a long time," and that he had "been put through an enormous amount of personal burden, cost, and expense." Edlund testified that the California litigation was "awkward" and "embarrassing" for him, and that it appeared "unprofessional before the courts in California as well as other courts in which [he] practiced [law]." Finally, Edlund testified that Brants had become the general partner of Calpetco III-1980, and that he hoped that a release of the claims against Brants would enable him to "devote his resources" to "making [Calpetco III-1980] a more profitable [investment]." For all of these reasons, Edlund testified, he "wanted all of the litigation brought to an end."

The district court apparently was not persuaded by Edlund's testimony, and neither are we. Presumably the California settlement alleviated any expense or embarrassment suffered by Edlund simply by releasing the claims against him. There is no reason why Edlund should have been embarrassed or inconvenienced by the Texas lawsuits, to which he was not a party. Consequently, Edlund's alleged expense and embarrassment do not explain why he would endeavor to bring the litigation in Texas to an end. We also find unconvincing Edlund's claim that he sought a release for Brants in order to enable Brants to devote more of his resources to the management of Calpetco III-1980. Had that been Edlund's goal, he might have accomplished it by bargaining for a release of the claims against Brants alone. However, Edlund claimed that he negotiated "a release of all of the partners in the Calpetco partnership." There is no reason why Edlund would have purchased a release for all of the Calpetco partners if he was only interested in obtaining a release for Brants. Because Edlund's testimony is inconsistent and implausible, it does not persuade us that the California defendants had a vested interest in obtaining a release of the claims against Brants and Pitts and others similarly situated.

In light of the language of the entire settlement agreement, as well as the circumstances surrounding its execution, we conclude that the parties to that agreement did not intend that the FDIC's claims against Brants and Pitts be released. Consequently, the magistrate correctly held that Brants and Pitts were not released by the settlement agreement, and the magistrate did not err by

entering judgment in favor of the FDIC.

## III

For the foregoing reasons, we AFFIRM.